UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY GEORGE WOODS, | ) | CIVIL NO. 4:21-CV-1052-WIA |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| SUPERINTENDENT LAUREL | ) | |
| HARRY, *et. al.*, | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION pursuant to Rule 52(a)**

## I.    INTRODUCTION

Plaintiff, Barry Woods, (Woods or Plaintiff) filed a pro se complaint[1] alleging mistreatment while confined in the Restrictive Housing Unit (RHU) at SCI Camphill in 2019. This case comes before me on the consent of the parties.[2] Plaintiff was granted leave to file an amended complaint[3] and did so on October 3, 2022.[4] Defendants filed a partial motion to dismiss[5] which resulted in the dismissal of all

---

[1] (Doc. 1).The original Complaint names Superintendent Laurel Harry, DSFM Michael Gourley, Security Captain Mark Becker, Lieutenant Warner, Lieutenant Troutman, LPN Stacy Nolan, Three John Doe Corrections Officers, C.O. Kiner, PREA Coordinator David Radziewicz, BII Director James Barnacle, and BII Lieutenant Beth Evans.

[2] Docs. 13, 74.

[3] Doc. 46.

[4] Doc. 48. The amended complaint names James Barnacle, Mark Becker, Beth Evans, DSFM Michael Gourley, Superintendent Harry, Officer J. Kiner, Stacy Nolan, David Radziewicz, Lieutenant Troutman, Officer Remy R Reid, Officer Damian Iagovino, Officer Robert Donald Roth and Officer Derrick A Zimmerman.

[5] Doc. 53.

but five of the Defendants.[6] On November 20, 2024 Plaintiff filed a Rule 41 Dismissal of Defendants David Roth and Remy Reid and Plaintiff's claim under Pennsylvania's "Hate Crime" law.[7]

The remaining three Defendants are: C.O. Damian Iagovino; C.O. Jerry Kiner; and Sgt. Derrick Zimmerman. The remaining claims are: (1) Under 42 U. S. C. § 1983 for violations of plaintiff's Eighth Amendment rights to be free from excessive force (assault and battery) and inhumane conditions of confinement (the denial of nine meals in five days, and the denial of toilet paper, eating and drinking utensils, blanket, soap, toothbrush and toothpaste, showers, and a towel); (2) Under 42 U. S. C. § 1983 for violations of plaintiff's First Amendment right to be free from retaliation (for asking for protective custody and complaining about mistreatment); and (3) State law claims for the torts of Assault, Battery, and Civil Rights Violations under 42 Pa.C.S. §8309. As remedies Plaintiff seeks damages, attorney's fees, and costs.

---

[6] The dismissed defendants were Beth Evans (Staff Member of BII in Mechanicsburg, PA), DSFM Michael Gourley (Deputy Superintendent of Facilities Management ), Superintendent Harry (Superintendent SCI-Camp Hill), Stacy Nolan (LPN Medical Department SCI-Camp Hill ), David Radziewicz (PREA Coordinator for DOC Central Office Mechanicsburg, PA ), Lieutenant Troutman (Staff Member at SCI-Camp Hill ), James Barnacle (Director for DOC Central Office (BII) Bureau of Investigations and Intelligence in Mechanicsburg, PA ) and Mark Becker (Security Captain for SCI-Camp Hill)

[7] (Doc. 129). The amended complaint alleged violation of 18 Pa. C. S. § 2010 (Doc. 48, p 27).

At trial Defendants offered three (3) defenses: (1) The offensive acts by the officers did not occur; (2) The Defendants are entitled to sovereign immunity; and (3) The Plaintiff's physical injuries, if any, do not meet the seriousness level required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.

A non-jury trial was held before me on Tuesday, February 4, 2025. Pursuant to Federal Rule of Civil Procedure 52(a) I make the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

1.    At all times relevant to this matter, Plaintiff was incarcerated at SCI-Camp Hill and housed in the RHU, also known as E Block, in cell E-C-1006 (E Block, C Pod, Cell 6). (Stipulation, Doc. 130, ¶ 1).

2.    At all times relevant to this matter, Defendants Iagovino, Kiner, and Zimmerman were employed by the Pennsylvania Department of Corrections (DOC) at SCI-Camp Hill and assigned to the RHU also known as E Block. (Stipulation, Doc. 130, ¶ 2).

3.    The front vestibule area of the RHU, where the alleged assault occurred, was not covered by CCTV cameras. (Stipulation, Doc. 130, ¶ 4).

4.    Plaintiff was charged in 2002, pled guilty in 2003, and was sentenced to state prison for sex crimes involving two of his daughters. He was originally paroled in 2011. (Plaintiff's testimony).

5.    Plaintiff was sent back to prison for a parole violation in 2019. He arrived at the SCI Camp Hill for classification and assignment on November 23, 2019. (Doc. 1, p. 4. ¶ C and Plaintiff's testimony).

6.    Plaintiff was 67 years old in December 2019. (Plaintiff's testimony).

7.    Plaintiff requested and received a transfer from general population to the RHU for his own protection. He feared assault from other prisoners because of his original conviction in 2003 as a child sex offender and the conduct of other inmates against him while in general population at SCI Camp Hill. Plaintiff arrived in the RHU on at 20:34 hours on Monday, December 23, 2019. (Plaintiff's testimony).

8.    Plaintiff was placed in Cell 6 in C Pod in E Block. (Stipulation Doc. 130, J. Ex. 35).

9.    When placed in Cell 6 the "RHU Package" (Joint. Ex. 15) with 20 items was not present. The only "package" items he received were a jump suit, canvas slides and a Styrofoam cup with the bottom torn out. When Plaintiff asked for toilet paper (one of the package items) on December 23, 2019, he was told not to speak to the officer ever again. The general regulations for E Block (the RHU) specify that inmates will receive regular showers and three meals a day along with the package items. Plaintiff did not get any toilet paper until late Wednesday, did not ever

receive the other package items such as soap, a towel or a blanket and was not provided a shower for six days. (Plaintiff's testimony and Joint. Ex. 15).

10. Cell 6 is one of only two cells in C Pod equipped with a double door wicket food box. (Exhibits J21-28). Instead of the more traditional meal slot or plain opening in a cell door, the wicket box has a lid on the top and a sliding door called a "ratchet door" into the cell. For food to be given to the prisoner, the person serving the tray unlatches and opens the lid, placing the tray and any other items in the box. The lid is then closed and latched. The food server then releases a second latch and opens the sliding ratchet door to allow the prisoner to take the tray and any other items. The sliding ratchet door to the box is then closed and latched. The procedure is reversed after the meal to retrieve the tray and any other trash items. In 2019 the RHU only used Styrofoam trays to feed the inmates. (Ex. J. 35, p. 2) (Testimony of Plaintiff and Defendant Iagovino).

11. On Tuesday, December 24, 2019, Plaintiff was taken from his Cell in C Pod to the lieutenant's office in B Pod for a Psychology Team Review (PRT) conducted by two psychologists. (Testimony of Plaintiff and Defendant Iagovino).

12.    There is a short hallway under the "bubble" between pods B & C. There is an electronic sliding metal door with a half window on the top at each end of the hallway. The doors are opened and closed by the "bubble" officer in response to shouted requests from staff at the doors. (Testimony of Plaintiff, all three Defendants and Joint Ex. 36).

13.    Plaintiff testified as follows about an assault that took place in the B-C hallway when he was returning from his PRT meeting.  He was escorted by two officers to the Lieutenant's Office in B pod. While out of his cell he was always constrained by Level 5 restraints (handcuffs and tether or leash). During the return trip the officers were not wearing nametags and he did not know their identity at that time. A third officer joined them in the hallway on the return trip. He also was not wearing a nametag. When both doors were closed the officer behind him punched him in the back and asked, "Why are you here?' Plaintiff replied, "A parole violation." The same officer struck him in the back again and said, "try again." Plaintiff repeated "A parole violation." Plaintiff was punched in the back a third time and an officer said, "Your daughters, really?" During this time Plaintiff was kicked in the leg multiple times. An officer then said, "If you don't check yourself out, I am going to kill you." The officer repeated the threat and said, "Do you understand?"

Plaintiff responded, "Yes, I understand." Plaintiff was then returned to his cell. While in his cell he yelled, demanding to see a lieutenant. None came and he was not provided lunch. Eventually Liutenant Troutman, Officer Tobias and Nurse Nolan came to his cell. He told them what happened, nurse Nolan looked at his leg and took pictures. Troutman said he did not have immediate access to the videos, but he would review them later and get back to Plaintiff. He also told Plaintiff that he would get him some toilet paper. He never returned. Plaintiff testified that the nurse did not treat his wound or provide any other first aid and that he ripped a piece of his bedsheet and used it to clean the blood. His leg hurt for several days. He has no scarring on his leg from the kicks. Plaintiff was angry, confused, and afraid after this assault. (Plaintiff's testimony).

14.    Regarding denial of meals Plaintiff testified that he did not receive lunch on December 24th. He did receive dinner from the second shift officers that night and every night while in the RHU. For the next four days he did not receive Breakfast or Lunch from the first shift officers, but he did receive dinner every day from the second shift officers. Plaintiff reviewed the eight videos of mealtime (Joint. Exhibits J21 to J28) during his testimony. He stated categorically that he did not receive

any food for those eight meals because either: no food was placed in the box (breakfast on December 24, 2019, and December 28, 2019); he was provided an empty tray (December 27, 2019) at breakfast); or that the ratchet sliding door was never opened long enough for him to retrieve his food. Plaintiff recalled the following comments made by the officers that denied him meals. At breakfast, (December 25, 2019) "You think your pretty slick don't you." At breakfast (December 26, 2019) "You have to be quicker than that." At breakfast on December 28, 2019 "He must be on a hunger strike." Plaintiff tried to complain on December 25, 2019, but no officer would respond to his shouting. He gave up trying to complain about denied meals but was concerned because he did not know how long he would be at Camp Hill, and he was very hungry during the day. (Plaintiff's testimony).

15.    Plaintiff testified that he believed the officers knew about his 2003 child sex offense conviction and treated him the way they did because of it. (Plaintiff's testimony).

16.    Plaintiff did not file a grievance or make a formal complaint until he was transferred to SCI Phoenix. He did not complain after he spoke to Lieutenant Troutman while at SCI Camp Hill because he feared

retaliation, a fear that was confirmed by the denial of meals on first shift for four straight days. (Plaintiff's testimony).

17.    Officer Damian Iagovino (hereafter Iagovino) testified that he has worked in the SCI Camp Hill RHU for over eight years, he has also worked in general population and CDCC.[8] He has had training as a CERT Team member, pepper ball usage, and in Level 5 custody procedures. His assignments when in the RHU consists of feeding, showering and exercise yard supervision and escorting inmates to appointments outside the RHU. At all times relevant to this lawsuit, he worked the 6:00 a.m. to 2:00 p.m. shift.

18.    Iagovino described the procedures in the RHU as follows. Inmates are assigned to the RHU for either discipline or administrative purposes, in other words, either for protection or investigation. When assigned to the RHU, a lieutenant interviews the inmate and fills out a questionnaire, a sergeant searches the inmate, and the inmate is then given a "set up." Iagovino testified that the inmates do not have to say why they are in the RHU. All inmates in the RHU are moved the same way, cuffed, with a belly belt and leash and two officers accompanying.[9] This is true, even

---

[8] The terms CDCC and CERT Team were not further defined during the trial.
[9] This is known as "Level Five restraints."

if an inmate is only in protective custody. (Defendant Iagovino's testimony).

19.    The officers rotate working shifts either on the floor or "in the bubble." The bubble officer works a full shift in the bubble and runs the controls for the doors and other electronic items from the bubble. Regarding meals, when the food cart arrives, there is a tone and an announcement from the bubble officer. The food arrives in a hot box from the kitchen brought in by the kitchen staff. In the RHU in 2019, all food was served in Styrofoam containers. When inmates are scheduled for the psychology review team (PRT) they are escorted into B-pod where they meet with the PRT team in the lieutenant's office. (Defendant Iagovino's testimony).

20.    On December 24, 2019, Iagovino escorted Woods into B-pod for his PRT evaluation. Video Exhibit J-19 shows Iagovino and Woods coming out of the B-pod lieutenant's office. Officer Reid is standing in the doorway as a part of the escort. They leave the frame of "camera 10" at 09:47.19. Iagovino positively identified himself and Woods. (Defendant Iagovino's testimony).

21.  Video Exhibit J-20 shows them entering the C-pod side of E Block into the cell area at 09:49.56 and escorting Woods to his cell. Woods does not appear to be limping.

22.  Iagovino was behind Woods always holding the tether during this escort. Iagovino specifically denied kicking Woods at any time. (Defendant Iagovino's testimony).

23.  On cross examination, Iagovino explained that in 2019 the electronic inmate information system was called "Doc-Info" but it is now called "Capture." In 2019 the corrections officers in E block would have access to "Doc-Info" and that system would include both the initial reason for the inmate being in jail and his "write up history" while in custody. (Defendant Iagovino's testimony).

24.  Iagovino was cross examined about exhibit J-37 an excerpt from the inmate handbook dated 2017. The handbook specifically says that denial of food is not to be used as a disciplinary measure. Iagovino also testified that he did not have any reason to use force against Woods as force is defined in J-37.

25.  Iagovino admitted that inmates convicted of sex crimes are treated differently by the other inmates. He denied that he personally did so. (Defendant Iagovino's testimony).

26.    Iagovino also explained that Exhibit J-16 is a Confidential Level 5 Housing policy statement and that it applies to E-Block.  Inmates who fail to follow the prescribed meal procedure will be treated as a voluntary refusal. All inmate activity is logged into a sheet called a 17X.[10] This would include a form for Woods. Each meal shower, exercise and escort should be logged in the 17X. Iagovino logged every inmate's information on every shift, including Woods.

27.    Iagovino testified that if an inmate did not follow the correct meal procedure, as outlined in Exhibit J-15, the action would be treated as a "voluntary refusal of the meal." (Defendant Iagovino's testimony).

28.    Exhibit J-15 (General Rules and Regulations Governing the RHU, issued  September 17, 2019, regarding meals states in relevant part:

> 11. Three (3) meals are served in the RHU per day. Each inmate shall receive a Lexan or Styrofoam tray at each mealtime. An announcement will be made that meals are being passed out. Inmates are directed to have the light on and be standing at the rear of the cell facing the cell door with their hands, visible, and fully dressed. Any <u>behaviors that create a safety or security risk to the opening of the food aperture</u> will result in a voluntary refusal of the meal. . . . (emphasis added).

29.    Stacy Nolan, LPN, testified that she has worked a SCI Camp Hill for seven years and was working the second shift (2:00 p.m. – 10:30 p.m.)

---

[10] A Sample DC-17X is contained in Exhibit J-16.

on December 24, 2019. She has been an LPN since 2014. She was making afternoon rounds when she was asked to examine Woods. She was told that he had an injury, so she went back to medical to get a camera before examining Woods. She examined Woods, took five photos (Exhibit J-14), and later prepared a DC-457 medical injury report (Exhibit J-12). She described the wound on Woods' shin as a "small abrasion" less than 2" across. She did not observe any bruising and could not say how long the dried blood, visible in the photos, was present. She indicated that she did not think the injury came from being kicked. (LPN Nolan's testimony).

30.    In her report (Exhibit J-12, p. 3) she completed this question and answer: "**Describe exactly what happened, why it happened, and actions(s) taken:** Individual reports being kicked." Nowhere in the report or in her testimony did she answer the rest of the question. (Exhibit J-12).

31.    LPN Nolan displayed a complete lack of curiosity as to how the injury could have happened (in both her testimony and report) or when exactly it happened. Her opinion that the injury could not be from a kick is not based upon any medically identified criteria and will be evaluated as her personal as opposed to professional opinion.

32.     She admitted on cross examination that she did not ask Woods to stand and walk so she could not opine if his gait was affected. She did not know when the injury occurred. She did not provide any medical treatment to the wound or clean off the dried blood. (LPN Nolan's and Plaintiff's testimony).

33.     C.O. Jerry Lee Kiner (hereafter Kiner) testified that he has worked at SCI Camp Hill for eleven (11) years and is currently assigned to the visiting room on day shift (8-4). In December of 2019 he was working first shift (6:00 a.m. – 2:00 p.m.) in the RHU. He testified that the DocNet system provided only a stability Code A-D and that other details about an inmate and his crimes would be in a different system. He testified that he does not remember Woods and does not remember doing his intake for the RHU in 2019. It was his experience that the meal announcement was always made before the trays were passed. (Defendant Kiner's testimony).

34.     Kiner reviewed each of the meal videos (EX.J – 21 to J – 28) while testifying.   Kiner is seen passing the trays on December 25 lunch, December 26 breakfast and lunch, December 27 breakfast and lunch, and December 28 breakfast and lunch. He admits that he did not serve Woods a meal on the December 25, 2019, (lunch) or December 28,

2019, (breakfast) because Woods was not following protocol. But he testified that he served Woods all his other meals. He also testified that he "never played games with the wicket," that he never denied Woods a meal because of his charges, and that he did not know why Woods was incarcerated. He testified that he would have entered the "refusal" of the meals on December 25, 2019, and December 28, 2019, in the 17X log. (Defendant Kiner's testimony).

35.    The final witness at the trial was Sgt. Derrick Zimmerman (hereafter Zimmerman). He testified that he has worked at SCI Camp Hill for 25 years. In 2019 he worked in the RHU and saw himself in the meal videos only once (J-21, the December 25, 2019, breakfast). He testified that he did not serve Woods because Woods did not comply with the security protocol to stand at the back of the cell with his hands exposed. He testified that Woods was standing but had his hands tucked under his armpits.  He provided a written report dated February 26, 2020, as a part of an internal DOC investigation. (Doc. 17). In that report he states that he did not receive any information that Woods was assaulted. Zimmerman testified on cross examination that staff do share stories about problem inmates but denied talking about Woods with others. He admitted that in 2019 he would have had access to the full information

about Woods, including his original conviction. (Defendant Zimmerman's testimony).

36. There is no evidence that Woods ever received the "block rules" covering items like how to stand for meals and Woods denied receiving them.

37. All three officers testified that if an inmate did not stand at the back of the cell with his hands exposed, they would treat this action as a voluntary refusal of the meal and log it in the DC-17X. However, Exhibit J-15, (the RHU rules), states that: "Any behaviors that create a safety or security risk to the opening of the food aperture will result in a voluntary refusal of the meal." The food aperture on Wood's cell was a box with two secure openings between the inmate and the officer. No officer explained how Wood's actions created a safety or security risk to the opening of the food aperture when it was boxed in the way it was in Cell 6.

38. Woods' testimony that he was assaulted in the short hallway by guards who were not wearing nametags and his description of what they said to him was credible and has been proven by a preponderance of the evidence. The only officer positively identified as one of the three involved was Iagovino.

39.    Woods' testimony that he did not receive nine meals over five days was credible. His description of the use of the inner wicket slide to deny him meals was credible and has been proven by a preponderance of the evidence.

40.    RHU Policy requires three showers per week and those showers were to be done on first shift in C Pod where Woods was housed. (Ex. J-16, p. 1-23; Ex. J-15, p. 1).

41.    Although the DOC regulations require the completion of a DC-17X log for each inmate in the RHU and the officers testified that they completed them for Woods during the week of December 24, 2019, they were not produced by either party.

## III.    DISCUSSION

In this case the Court is called upon to reconcile competing narratives about what occurred in the SCI Camp Hill RHU between December 24th to 28th, 2019. On one side is the Plaintiff, a convicted sex offender back in prison on a parole violation, on the other three defendant prison guards and a prison nurse. The standard of proof in civil litigation is preponderance of the evidence.[11] The preponderance of the evidence standard is simply: "Is it more likely that something happened than not?"[12]

---

[11] *E.M.D. Sales, Inc. v. Carrera*, 145 S. Ct. 34, 37 (2025).

[12] *United States v. Santos*, 932 F.2d 244, 248 (3d Cir. 1991); *United States v. Stimpson*, 113 F.4th 350, 354 (3d Cir. 2024)

Plaintiff testified credibly. His testimony establishes that he was assaulted and threatened with harm (in the vestibule between C-Block and B-Block) if he did not sign himself out of the RHU. The officers who assaulted him in the vestibule clearly knew that he was a convicted child sex offender, with his crimes involving his daughters. Other than Iagovino, who testified that he was holding the tether during the PRT move, no other officers were positively identified in the vestibule. Following the battery and threats in the vestibule, the first shift guards denied Woods showers and nine meals over five days. The videos of eight of the nine mealtimes do not conclusively show that Plaintiff was in fact fed.[13] There was no video offered for lunchtime on December 24, 2019, right after the vestibule incident.

Plaintiff denied being the inmate in the J-19 video, but Iagovino said the inmate was Woods and that he was right behind him. I believe that Woods was the escorted inmate shown in exhibits J-19 and J-20. The time computation between Woods leaving the frame in video J-20 and arriving in frame in video J-21 is short, two minutes and thirty-seven seconds, but long enough for the events Plaintiff described to occur in the vestibule. There was no camera in the vestibule in 2019 and the bubble officer does not have a view of the inside of the vestibule. There are windows above waist height on both doors of the vestibule, but there was no

---

[13] Joint Exhibits J19 to J28.

evidence that any officer was standing on the outside of either door looking in while the assault took place.

In short, I believe that a preponderance of the evidence establishes that Woods was threatened, assaulted, and denied meals and showers while in the RHU because he exercised his First Amendment Right to ask for protection in the RHU.

The policies of the DOC are laid out in Exhibit J-16. These policies would not permit unnecessary threats, assaults, battery, or the denial of meals and showers. In fact, physical safety, three meals a day, and three showers a week are the official policy of the DOC in the RHU. (Exhibit J-16).

## A.    EIGHTH AMENDMENT CLAIMS

Claims for constitutional violations are enforced under § 1983. "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States."[14] "It is well settled that § 1983 does not confer any substantive rights, but merely 'provides a method for vindicating federal rights elsewhere conferred.'"[15] To prove a claim under § 1983, a plaintiff must establish two things: (1) a deprivation of a federally protected right; and (2) that the

---

[14] *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005) (citing *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000)).

[15] *Williams v. Pa. Human Rel. Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017) (quoting *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014)).

deprivation was committed by a person or persons acting under color of state law.[16]

Plaintiff brings two distinct Eighth Amendment Claims: one for the use of excessive force and one for the conditions of confinement. I will address each in turn.

### 1.    Use of Excessive Force

Plaintiff alleges that the incident in the vestibule constituted the use of excessive force in violation of his Eighth Amendment rights. The Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishment, protects convicted prisoners from malicious and sadistic uses of physical force by prison officials.

"To demonstrate that a prison official defendant has violated the Eighth Amendment, a plaintiff must establish two (2) elements: a subjective and an objective element."[17]

"First, the plaintiff must show that the defendant acted with a sufficiently culpable state of mind."[18] "Where a prison official is alleged to have used excessive force in violation of the Eighth Amendment, the pertinent inquiry for the subjective

---

[16] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (quoting *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997)). In this case the parties agree that the Defendants were acting under color of state law. (Stipulation, Doc. 130, Joint Exhibit 35).

[17] *Blair v. Carl*, No. 1:24-CV-00211, 2024 WL 3850444, at *8 (M.D. Pa. Aug. 15, 2024) (internal citations and quotations omitted).

[18] *Id. citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

element is whether [the] force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."[19]

"Second, the plaintiff must show that the defendant's conduct was objectively sufficiently serious[.]"[20] "The pertinent inquiry for the objective element is whether the prison official's actions were harmful enough, or sufficiently serious"[21] "The Eighth Amendment prohibits the use of force that offends contemporary standards of decency[,] regardless of whether significant injury is evident[;] although, the extent of injury may provide some indication of the amount of force applied or whether the use of force could plausibly have been thought necessary in a particular situation."[22] "To establish an Eighth Amendment excessive force claim, an inmate does not need to show that he suffered a significant, or even a more than de minimis, injury. Rather, the central issue is the force used by the officer, not the resultant injury."[23]

---

[19] *Id. At p. 8. Citing Hudson v. McMillan, 503 U.S.1 at 7; Chavarriaga v. N.JU. Dept of Corr., 806 F.3d 210 at 231 (explaining that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated[,]" and "[t]his is true whether or not significant injury is evident").*
[20] *Id. Citing Wilson v. Seiter, 501 U.S. 294, 297 (1991).*
[21] *Id.*
[22] *Id. Citing Wilkins v. Gaddy, 559 U.S. 34 (2010).*
[23] *Warrick v. Harry*, No. 3:23-CV-591, 2024 WL 2059084, at *5 (M.D. Pa. May 8, 2024) (citing *Wilkins*, 559 U.S. at 37; *Flood v. Schaefer*, 439 F. App'x 179, 182 (3d Cir. 2011)).

Applying these factors in this case, there was no need for any force. Plaintiff was not actively making any verbal or physical threats. He was attempting to escape. He was shackled in a belly chain with a tether surrounded by three officers in a confined space.[24] "Punching and kicking someone who is handcuffed behind his back ... is 'repugnant to the conscience of mankind,' absent the extraordinary circumstances necessary to justify that kind of force." [25]

The use of force by Iagovino in the vestibule, in the context of the conduct of the other officers, was malicious and evidenced a delight in cruelty. There was no legitimate reason for the use of force or the accompanying threats. Plaintiff was in fact physically injured as evidenced by his bleeding. He has met his burden to show that he was the victim of excessive force in violation of his Eighth Amendment rights. Officer Iagovino participated in the assault and battery in the vestibule and is personally responsible for his role in the incident.

### 2.    Conditions of Confinement

In the context of a prison conditions of confinement claim, Judge Eddy from the Western District of Pennsylvania has described the legal standard succinctly:

The Eighth Amendment as applied to the states through the Fourteenth Amendment prohibits the infliction of "cruel and unusual punishments." It prohibits deprivations suffered during incarceration "that constitute an

---

[24] Testimony of both Woods and Iagovino.

[25] *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (quoting *Hudson v. McMillian*, 503 U.S. 1 at 10), *Gordon v. Garvin*, No. 24-CV-6365, 2025 WL 209179, at *4 (E.D. Pa. Jan. 15, 2025).

'unnecessary and wanton infliction of pain,' including 'those that are totally without penological justification.' " A successful Eighth Amendment claim based on a prisoner's conditions of confinement has two components. "First, 'the deprivation alleged must be, objectively, sufficiently serious,' resulting in 'the denial of the minimal civilized measure of life's necessities.' " This is a totality-of-the circumstances analysis. "Conditions ... alone or in combination[ ] may deprive inmates of the minimal civilized measure of life's necessities," and "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise."

That said, the Supreme Court has recognized that not every discomfort or inconvenience experienced by prisoners implicates the Eighth Amendment. Thus, "only those deprivations denying the minimalized civilized measures of life's necessities 'are sufficiently grave to form the basis of an Eighth Amendment violation.' " (all citations omitted).[26]

The Eighth Amendment prohibition against cruel and unusual punishment demands that prison officials do not house inmates under conditions that deprive them of one or more basic human needs, such as the basic human need for reasonable safety, adequate physical space, and the need for some degree of ventilation and fresh air.[27] However, the Eighth Amendment does not mandate that prisons be free of discomfort.[28] "No static test determines whether conditions of confinement are

---

[26] *Lee v. Janosko*, No. 18-CV-1297, 2021 WL 877761, at *6 (W.D. Pa. Mar. 9, 2021).
[27] *Helling v. McKinney*, 509 U.S. 25, 32 (1993).
[28] *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

'cruel and unusual.' These terms must 'draw [their] meaning from the evolving standards of decency that mark the progress of a maturing society.' " [29]

Conditions of confinement claim has two main elements or prongs.

Conditions-of-confinement claims have two prongs: (1) an objective prong, under which the alleged injury must be sufficiently serious, and (2) a subjective prong, under which the prison official who imposed the condition must have done so with deliberate indifference. See, e.g., *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
An official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S.Ct. 1970. [30]

To establish an Eighth Amendment conditions of confinement claim, an inmate must show that he was deprived of "the minimal civilized measure of life's necessities." [31] This includes showing that the conditions of his confinement pose "a substantial risk of serious harm" to his health or safety. [32] In reviewing this type of claim, courts have stressed the duration of the complainant's exposure to the alleged unconstitutional conditions and the "totality of the circumstances" as critical to a finding of cruel and inhumane treatment. [33]

---

[29] *Tillery v. Owens*, 719 F.Supp. 1256, 1261 (W.D. Pa. 1989) (citing *Rhodes*, 452 U.S. at 346).
[30] *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)
[31] *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997).
[32] *Farmer*, *supra*, 511 U.S. at 834.
[33] *Rhodes v. Chapman*, 452 U.S. 337, 362–63.

In this case, the denial of nine meals (all on the first shift) over five days, coupled with the taunts at mealtime and the denial of showers and "kit" items[34] like soap, towel, blanket, cup, and eating utensils are a "totality of circumstances" that presented a substantial risk of serious harm to Plaintiff's health, justify a finding of cruel and inhumane treatment in violation of the Eighth Amendment. The need for food is a basic human need. The denial here was deliberate indifference designed to both deprive and taunt Woods. Officers Zimmerman and Kiner personally participated in at least some but not all this conduct. They must have realized the effect on Woods, were deliberately indifferent to it, and are personally responsible for their roles.

## B.    PLRA PHYSICAL INJURY REQUIREMENT FOR MENTAL OR EMOTIONAL INJURY:

A prisoner's ability to recover compensatory damages for mental or emotional injury is specifically limited by the 1996 Prison Litigation Reform Act. The PLRA states in relevant part that:

---

[34] Regarding the denial of toilet paper, the Court of Appeals for the Third Circuit has held that the temporary denial of toilet paper does not ordinarily violate the Eighth Amendment. *Brooks v. Bledsoe*, 682 F.Appx. 164, 170 (3d Cir. 2017) (affirming dismissal of 8th Amendment claims on, among other things, denial of toilet paper). In 2015 the Circuit held that that the denial of toilet paper for approximately seven days did not violate the Eighth Amendment. *Freeman v. Miller*, 615 Fed. Appx. 72, 77 (3d Cird. 2015). In this case the denial was one or two days. This denial, alone, would not be enough to state an 8th Amendment claim, but it is a factor in my conclusion that the totality of the circumstances of the conditions of confinement in the RHU violated Plaintiff's 8th Amendment rights.

(e) Limitation on recovery

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for <u>mental or emotional injury</u> suffered while in custody without a prior <u>showing of physical injury</u> or the commission of a sexual act (as defined in section 2246 of Title 18).[35]

The Third Circuit has adopted a more than *de minimis* standard when a prisoner seeks damages for mental or emotional injuries. In applying the PLRA to a claim for damages the court stated:

We believe that reading 1997e(e) to allow a plaintiff to allege any physical injury, no matter how minor, would produce an unintended (indeed absurd) result. Were we not to read 1997(e) as requiring more than a *de minimis* physical injury, we would turn its physical injury prerequisite into a mere pleading requirement, thereby rendering the requirement meaningless as a practical matter. Another prisoner might be able to assert an emotional injury by pleading that he received a paper cut, for example. This result runs counter to Congress's intent "to curtail frivolous and abusive prisoner litigation." [36]

The physical injury requirement of § 1997e requires a plaintiff to establish "a less-than significant-but more-than-*de minimis* physical injury as a predicate to allegations of emotional injury."[37] "The Third Circuit has not provided a bright line rule for district courts to follow when applying this test to prisoner claims."

---

[35] 42 U.S.C. § 1997e(e) (emphasis added).

[36] *Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003)
[37] *Id.*

Nevertheless, "[d]istrict courts have been hesitant to find that an identifiable bodily injury was *de minimis* as a matter of law."[38]

Two district court cases in this circuit illustrate the type of injuries that courts will recognize as *de minimis* as a matter of law.[39] In *Knight v. Walton*, correctional officers placed the prisoner plaintiff face down on his bed and grabbed him by his wrists during a search of his cell.[40] As they continued to search the cell, the officers removed the plaintiff from his cell, placed him in a restraint chair, and strapped him to the chair. The plaintiff was subsequently removed from the restraint chair and then strapped back into it twice more before being returned to his cell. The plaintiff raised claims for mental and emotional injuries from the incident.[41] The court held that the plaintiff's physical injuries "if they existed at all, were *de minimis*" because "the numbness and lacerations resolved within sixteen days."[42]

---

[38] *Hyman v. Giorla*, No. 10-CV-00499, 2014 WL 881137, at *6 (E.D. Pa. Mar. 5, 2014).

[39] *Powell v. Pennsylvania Dept of Corr.*, No. 1:12-CV-02455, 2019 WL 8510289, at *9 (M.D. Pa. July 15, 2019), *report and recommendation adopted,* No. 1:12-CV-02455, 2020 WL 1922639 (M.D. Pa. Apr. 21, 2020).

[40] *Knight v. Walton*, No. 2:12-CV-00984, 2015 WL 9243902, at *2 (W.D. Pa. Sept. 24, 2015), *report and recommendation adopted* 2:12-CV-00984, 2015 WL 9239003, at *1., *aff'd,* 660 F. App'x 110 (3d Cir. 2016).

[41] *Id.* at *9.

[42] *Id*. at *6.

In *In re Bayside Prison Litigation*[43] the prisoner plaintiff was called into the internal affairs office of the prison to be interviewed by internal affairs personnel about his possible involvement in the murder of a prison official. After the plaintiff arrived in the office, two officers forced him to face a wall and one of the officers told him to place his left hand above his head and tell the officers everything he knew. The officer then grabbed the plaintiff's hand and hit it with a stick.[44] The plaintiff brought claims for the mental and emotional injuries he suffered from the incident, but the court found that the plaintiff's physical injuries were *de minimis* where the plaintiff suffered "pain and swelling in his pinky finger for approximately two days" which "eventually subsided" and led to no "significant restriction of his activities."[45]

While these cases do not set bright lines (injuries that resolved in two or sixteen days), they do inform my decision that the damages from the "punches and kicks" Woods received are not "serious injuries" and are not "more than *de minimis*" specifically for the purposes of meeting the limitations set out by the PLRA. What happened to Woods in the vestibule was wrong, but it does not rise to the PLRA injury standard to allow damages for mental or emotional distress.

---

[43] *In re Bayside Prison Litigation*, No. 09-CV-02365, 2010 WL 4916716, at *1 (D.N.J. Nov. 23, 2010).

[44] *Id.* at *1.

[45] *Id.* at *3.

The PLRA bars the Eighth amendment use of force claim in this case for mental or emotional distress in this case. Likewise, the denial of nine meals on first shift over five consecutive days as a condition of confinement under the Eighth Amendment, as suffered by Plaintiff, is not the type of physical injury required by the PLRA to recover for mental or emotional injury.

## C.    RETALIATION

The First Amendment protects from government retaliation for exercising the right to free speech. Retaliation for free speech is a violation of the Constitution. To state a First Amendment retaliation claim, a prisoner must prove that (1) "he was engaged in constitutionally protected conduct," (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the inmate's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action.[46]

To determine if a prisoner has a § 1983 complaint, the court must first identify the claimed constitutional violations.[47] In this case Plaintiff alleges that his

---

[46] *Ramey v. Marsh*, 4:21-CV-01018, 2022 WL 363854, (M.D. Pa. February 7, 2022) (citations omitted).

[47] *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("The first step in any [Section 1983] claim is to identify the specific constitutional right allegedly infringed."); *Graham v. Connor*, 490 U.S. 386, 394 (1989) (explaining that analysis of a Section 1983 claim requires "identifying the specific constitutional right allegedly infringed by the challenged" conduct).

constitutionally protected conduct was twofold, first, asking for a transfer to the RHU to be protected from other inmates and second, complaining to Lieutenant Troutman and LPN Nolan about the assault in the vestibule. Plaintiff has shown with both instances of speech that he engaged in "protected conduct."

Next Plaintiff must show that he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. Here Plaintiff alleges two distinct "adverse actions."

The first adverse action occurred less than fifteen hours after he was transferred to the RHU and during the first time he was out of his cell. He was punched, kicked, threatened, and told by a guard that he must ask to be transferred out of the RHU or he would be killed. This incident in the vestibule was an "adverse action." [48] Plaintiff had a continuing right to request protection in the RHU. A person of ordinary firmness would be deterred from exercising their right to speech by asking for RHU protection under those circumstances.

The second "adverse action" was the denial of meals, showers, and "kit" items while in the RHU.[49] None of these incidents, in isolation, would be an adverse action. However, taken collectively they do. All the actors that participated in these denials were first shift officers. I conclude that a person of ordinary firmness would be

---

[48] See Findings of Fact # 13, 38 (supra).
[49] See Findings of Fact # 9, 14, 36, 37, 39, and 40.

deterred from exercising their right to speech (by asking for RHU protection or complaining about the assault) under those circumstances. An inmate cannot be expected to freely exercise his First Amendment rights when facing a concerted effort by a group of guards to shut him up. I find, based on the evidence presented at trial, that is what the guards did.

Next, we must decide if the inmate's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action.[50] This is sometimes referred to as a causal link between the exercise of his constitutional rights and the adverse action.[51]

Defendant Iagovino participated in the vestibule incident. Defendants Kiner and Zimmerman denied Plaintiff nine meals over five days. None of them provided him with the "kit" items or showers. The motive or link for the vestibule incident is explicit. The denials over the next five days are more circumstantial.

### 1.    Substantial or motivating factor during the vestibule incident

The substantial or motivating factor of the officers during the assault and battery in the vestibule is obvious to me by their collective conduct. I have found

---

[50] *Ramey v. Marsh*, 4:21-CV-01018, 2022 WL3 63854 (M.D. Pa. February 7, 2022) (citations omitted).
[51] *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (internal quotation marks omitted) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)). *See*, *Lee v. Janosko*, No. 18-CV-1297, 2021 WL 877761, at *9 (W.D. Pa. Mar. 9, 2021).

that the description provided by Woods[52] is more persuasive than the denial provided

by Iagovino[53] and proven by a preponderance of the evidence The combination of

punching, kicking, and threatening a shackled inmate with death if he did not comply

with the officer's demand to give up his right to request protection in the RHU shows

their improper motivation. He was asked twice if he understood that he had to ask to

leave the RHU. The fact that he is a convicted pedophile may have inspired their

hatred, but they expressed that disdain by telling him he could not ask for protection,

a right clearly protected by the First Amendment.

### 2.    Substantial or motivating factor during the denial of meals, etc.

To satisfy the adverse action requirement, a plaintiff must show that,

objectively, the action "was sufficient to deter a person of ordinary firmness from

exercising his First Amendment rights." Here, Woods was threatened and told to

check himself out of the RHU. He believed he was denied meals because he asked

to be put into the RHU and would not leave voluntarily and because he complained

about the assault. Denying him meals, showers, and kit items was an adverse action,

wrong, and in violation of the prison rules. It was the type of conduct that would

deter a person of ordinary firmness from exercising a constitutional right. Regarding

the third part of the test, I find Woods' request to be in the RHU, and his later

---

[52] Findings of Fact ¶¶ 11, 12, 13, 20, and 38.
[53] Findings of Fact ¶ 38.

complaint about the assault, was a "substantial or motivating factor" for Zimmerman and Kiner to deny him first shift meals. The fact that Woods was a convicted sex offender, by itself, could have been the motive behind their torment, but there is no fact in this record to support that interpretation. The only evidence about their motive comes from the Plaintiff. His belief is supported by the timing and circumstances of the taunts and manipulation of the food slot that I have found was proven by a preponderance of the evidence. There simply is no other explanation for the lack of showers, soap, a towel, cup, or utensils for eating.  Plaintiff has met his burden.

### D.    STATE LAW ASSAULT AND BATTERY

The tort of assault requires that the defendant act with the intent to place the plaintiff in apprehension of imminent harmful or offensive bodily contact and that the plaintiff actually experience such apprehension.[54] Battery requires proof that the defendant acted with the intent to cause harmful or offensive bodily contact with the person of the plaintiff and that such contact actually followed.[55] The conduct of the officers in the vestibule on December 24, 2019 was both assault and battery.

---

[54] *See Heverly v. Simcox*, No. 4:05–1370, 2006 WL 2927262, at *9 (M.D. Pa. Oct. 11, 2006); *D'Errico v. DeFazio*, 763 A.2d 424, 431 n.2 (Pa. Super Ct.2000); *Dull v. W. Manchester Twp. Police Dept*, 604 F. Supp. 2d 739, 754 (M.D. Pa. 2009).
[55] *See Fulks ex rel. Daniel v. Gasper*, 439 F.Supp.2d 372, 379 (M.D. Pa. 2006); *Montgomery v. Bazaz–Sehgal,* 742 A.2d 1125, 1130 (Pa. Super. Ct. 1999); *Dull v. W. Manchester Twp. Police Dept*, 604 F. Supp. 2d 739, 754 (M.D. Pa. 2009).

Defendants, in their Statement of Defenses and Elements[56] correctly define the torts of assault and battery. They go on to assert that "Importantly, the harmful and offensive contact element of assault and battery claims against corrections officers is expanded by state law. "A staff member may not use any greater force against an inmate than is necessary to protect the staff member or others from bodily harm or to protect property from damage or destruction or to prevent a criminal act or to effect compliance with rules when other methods of control are ineffective."[57] I agree that corrections officers are permitted to use force, but only when necessary to protect or secure. The legal principle cited by Defense counsel does not connect to the facts of this case. There is no allegation anywhere that Woods was threatening bodily harm or damage to property or attempting to flee. Simply put, there was no reason to exert force or threats while the officers and Woods were in the vestibule. Since the officers deny any use of force or threats, the line of cases describing justifiable use of force by officers cannot apply. In this case, Plaintiff has proven that Iagovino kicked him multiple times, while other officers were punching and threatening him. That is both assault and battery.

---

[56] (Doc. 126, pp. 7-8).
[57] (Doc. 126, p. 8, citing cases).

### E.   IMMUNITY FROM STATE TORTS

The Defendants claim sovereign immunity and argue that is not waived for

intentional torts, citing *Mitchell v. Luckenbill*:

> Under Pennsylvania law, an action falls within the scope of
> employment if it: (1) is the kind that the employee is employed to
> perform; (2) occurs substantially within the job's authorized time and
> space limits; (3) is motivated at least in part by a desire to serve the
> employer; and (4) if force was used by the employee against another,
> the use of force is not unexpectable by the employer.[58]

While the conduct at issue in the vestibule arguably meets the first three

elements (*i.e.* escorting a prisoner within the jail), it cannot be argued that the DOC

expects officers to strike and threaten prisoners who are compliant with all

commands and not threatening anyone's safety.

Judge Nealon has summarized this exception to sovereign immunity in a case

where he found that the correction officers' conduct was immune because it was

necessary to their employment. In explaining the difference in the case before him

to three earlier cases of officer's assaultive conduct he said:

> This Court finds Plaintiff's reliance on these three cases is misplaced. In
> *Velykis, Robus,* and *Savage,* the use of force by corrections officers was
> unprovoked, unnecessary and unjustified by security concerns or
> penological goals, and, therefore, did not, as a matter of law, fall within
> the scope of employment.[59]

---

[58] *Mitchell v. Luckenbill*, 680 F. Supp.2d 672, 682 (M.D. Pa. 2010).

[59] *Gray v. Wakefield*, No. 3:CV-09-0979, 2014 WL 2526619, at *4 (M.D. Pa. June
4, 2014).

The Commonwealth Court has taken a similar position on immunity regarding assault and battery on prisoners by prison employees. For purposes of sovereign immunity, a prison guard acts outside the scope of his duties when he or she uses deliberate and unjustified force on an inmate totally divorced from any need of the officer to exert control over the prisoner.[60]

Sovereign immunity is an affirmative defense. An employee claiming sovereign immunity carries the burden at trial of proving that his conduct was within the scope of his employment.[61] The Defendants have not done so. The request for sovereign immunity for the actions of Defendant Iagovino in the vestibule is denied. The request for sovereign immunity for the actions of defendants Kiner and Zimmerman is denied.

### F.    CLAIM FOR PUNITIVE DAMAGES

Defendants have conceded that punitive damages are available under § 1983[62] citing a Middle District employment case.[63] According to that case, the conduct complained of in a § 1983 case must be at a minimum reckless or callous.

Under Pennsylvania tort law, punitive damages may be awarded "when the plaintiff has established that the defendant has acted in an outrageous fashion due to

---

[60] *Minor v. Kraynak*, 155 A.3d 114 (Pa. Commw. Ct. 2017).
[61] *Justice v. Lombardo*, 208 A.3d 1057 (Pa. 2019).
[62] Defendant's Statement of Defenses and Elements (Doc. 126, p. 3).
[63] *Judge v. Shikellamy Sch. Dist.*, 135 F. Supp.3d 284, 298–99 (M.D. Pa. 2015), *aff'd on other grounds,* 905 F.3d 122 (3d Cir. 2018).

either the defendant's evil motive or his reckless indifference to the rights of others."[64] A plaintiff may be entitled to punitive damages when she adduces evidence showing that "the defendant's acts amounted to intentional, willful, wanton or reckless conduct." Reckless indifference is characterized by conduct that "creates an unreasonable risk of physical harm to another [that is] substantially greater than that which is necessary to make his conduct negligent."[65]

I find that under both federal and state standards Defendant Iagovino's conduct merits punitive damages. The kicking and threatening of an unarmed man, in handcuffs secured with a tether, surrounded by three guards, while he is not resisting or even mouthing off creates an unreasonable risk of physical harm. Such an assault and battery, while not rising to the level of a severe beating or murder, is still outrageous. The officers' actions were malicious, wanton, willful and oppressive and showed a reckless indifference the interests of others.[66] The fact that the injuries do not qualify for recovery for mental or emotional damages under the limitations imposed by the PLRA does not preclude nominal or punitive damages.[67]

---

[64] *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).
[65] *Miller v. TJX Companies, Inc.*, No. CV 19-252, 2019 WL 1168120, at *3 (E.D. Pa. Mar. 12, 2019)
[66] PA SUGGESTED STANDARD CIVIL JURY INSTRUCTIONS, 8.00 - Punitive Damages (2024) and cases cited in the subcommittee note.
[67] *Allah v. Al-Hafeez*, 226 F.3d 247 (3d Cir. 2000); *Wilkins v. Gaddy*, 559 U.S. 34, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010).

## IV.   MISCELLANEOUS RULINGS

### A.   MOTION TO PRODUCE ADDITIONAL WITNESSES

At the conclusion of Plaintiff's case at trial the Plaintiff asked the court to consider the testimony of two witnesses, Remy Reid and Robert Roth, who were only subpoenaed the day before by delivering their subpoenas to the counsel for the remaining defendants. Counsel for the Defendants objected based on the "five-day" local rule.[68] The Plaintiff proffered that the two witnesses would explain the procedure for feeding inmates in the Special Housing Unit, which was relevant to his conditions of confinement claim. The Defendants responded that the procedure was not in dispute and that the three remaining named defendants would all testify about the procedure. The court deferred ruling on the motion until after the close of the evidence. Since the testimony of the Plaintiff and the three Defendants on this issue agreed on what the procedure was, the Plaintiff's motion for two additional witnesses is denied.

### B.   DEFENDANT'S RULE 50 MOTION

At the close of the Plaintiff's case in chief the Defendants made an oral motion for a Directed Verdict under F. R. Civ. P. 50. The court deferred ruling on the motion

---

[68] Local Rule 83.10.4 Subpoena Requirement, states in part that: "No trial shall be continued on account of the absence of any witness unless a subpoena for the attendance of such witness has been served at least seven (7) days prior to the date set for trial."

for the reasons stated on the record at the time of the motion. The defendant's motion for a judgment as a matter of law is denied.

## V.    CONCLUSIONS OF LAW

1.    At all times relevant to this matter, Defendants Iagovino, Kiner, and Zimmerman acted within the scope of their employment and acted under color of state law. Stipulation, Doc. 130, ¶ 3. This general stipulation by the parties does not preclude the Court from finding that one or more of the officers acted "outside" the scope of their employment while they were at their job and on the clock. I do not read the stipulation as a concession by Plaintiff's counsel that all conduct by the Defendant's was lawful, I read it only that they were working at their jobs when the conduct occurred.

2.    Plaintiff's claim for mental and emotional damages for being subject to cruel and unusual punishment in violation of the Eighth Amendment was not proven by a preponderance of the evidence to meet the PLRA standard.

3.    Plaintiff's claim for mental and emotional damages for suffering retaliation in violation of the First Amendment as limited by the Prison Litigation Reform Act was not proven by a preponderance of the evidence.

4.    Plaintiff's claim for Assault and Battery in the B-Pod/C-Pod vestibule on December 24, 2019, (Amended Complaint, Doc. 48, pp. 16-17, ¶ 5-10) was proven by a preponderance of the evidence. The use of force by Officer Iagovino and the two unidentified officers was outside the scope of their employment.

5.    Defendant's reliance on *Mitchel v. Luckenbill*, 680 F. Supp. 2d 672, 682 (M.D. PA 2010)[69] for their sovereign immunity defense is misplaced. While it is true that sovereign immunity is not waived for intentional torts, like assault & battery, the difference here is that, unlike the force used by the state police attempting to arrest Mitchel in his home, an unprovoked assault and battery of this kind (threatening, kicking, or punching a shackled compliant prisoner), was not within the scope of Iagovino's employment. Defendant Iagovino was not acting within the scope of his employment at the time of the assault and battery and is not entitled to sovereign immunity.

6.    Plaintiff's claim under the Pennsylvania civil rights statute, 42 Pa.C.S. § 8309 must fail because the conduct alleged and proven here does not fall within the scope of the predicate offenses (i.e. 18 Pa.C.S. § 2710,

---

[69] Doc. 126, pp. 10-11.

relating to ethnic intimidation or 18 Pa.C.S. § 3307, relating to institutional vandalism) required to violate the statute.

7.   Plaintiff is entitled to nominal damages against Iagovino under § 1983 for the assault and battery in the vestibule in the amount of one ($1.00) dollar.

8.   Plaintiff is entitled to Nominal Damages under § 1983 for Eighth Amendment conditions of confinement violations against Defendants Kiner (7) & Zimmerman (2) for the denial of meals in the amount of nine ($9.00) dollars, one for each meal.

9.   Plaintiff is entitled to compensatory damages for the torts of assault and battery committed in the vestibule by Defendant Iagovino in the amount three hundred ($300) dollars. Plaintiff suffered no financial loss for medical treatment, or permanent disfigurement, but he did experience pain from the deliberate kicks administered by Iagovino.

10.   Plaintiff is entitled to Punitive Damages against Defendant Iagovino under both § 1983 and Pennsylvania tort law in the amount of fifteen thousand ($15,000) dollars. The amount reflects the short but serious nature of his misconduct, that it was outrageous under state law, and is in amount designed to deter others from similar misbehavior.

An appropriate Judgment and Order will be entered in accordance with this opinion.

Date: February 28, 2025            BY THE COURT

                                   *s/William I. Arbuckle*
                                   William I. Arbuckle
                                   U.S. Magistrate Judge